# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
## CIVIL ACTION NO. 5:12-CV-186 (LEAD), 3:14-CV-504 (CONSOLIDATED)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| **Plaintiff,** | ) |
| v. | ) **ORDER** |
| ERIC APPELBAUM, | ) |
| **Defendant.** | ) |
| _____ | ) |
| CLAUDIA APPELBAUM, | ) |
| **Plaintiff,** | ) |
| v. | ) |
| THE UNITED STATES OF AMERICA | ) |
| **Defendant.** | ) |

**BEFORE THE COURT** is Defendant Eric Appelbaum's ("Appelbaum") Motion for Summary Judgment (Doc. 23), to which the United States has responded (Doc. 29). Defendant has filed a reply (Doc. 34) to the United States' response.

The United States instituted the instant action alleging that Warde Electric Contracting, Inc. ("Warde") did not properly collect, account, or pay over Federal Withholding and Federal Insurance Contribution Act taxes ("FICA" or "trust fund" taxes) for the quarterly tax periods ending June 30, 1999, September 30, 1999, December 31, 1999, September 30, 2000, and December 31, 2000 (the "Tax Periods."). (Doc. 1, ¶¶ 7, 11). The United States seeks to recover these taxes from Eric Appelbaum individually pursuant to 26 U.S.C. § 6672. (Doc. 1, ¶¶ 8-11).

1

The United States alleges that it is entitled to recover the amount of the assessments made on April 10, 2013 and accrued interests and costs. (Doc. 1, ¶¶ 11, 15-16).

I.       SUMMARY OF THE PARTIES' ARGUMENTS

Defendant's motion argues that (1) he was not a responsible person under § 6672; and (2) he did not willfully fail to collect, account, or pay over the trust fund taxes to the United States. Defendant largely relies on his own testimony to support his argument that he was not meaningfully involved in Warde from March 1994 to April 2002. Defendant argues that McCoy Glover was the sole responsible person at Warde after Appelbaum sold all of his common shares to Glover and ceased to have any ownership interest in Warde. After the sale, according to Defendant, Glover assumed the presidency, became a member of the board, and was in all respects in charge of Warde. Defendant argues that his lack of involvement is shown by, *inter alia*, the dearth of checks he signed. Defendant states he was informed by Glover that Glover had arranged an agreement with the IRS to pay the back taxes. According to Defendant, this provides indisputable evidence that he could not have acted willfully in failing to pay the trust fund taxes.

The United States argues that the Glover management arrangement was in large part a sham constructed to enable Warde to obtain a Minority Business Enterprise ("MBE") certification from the State of New York. Plaintiff argues that Warde's business was struggling and Appelbaum determined that the company needed a minority "owner" to obtain this valuable certification. The business could not appear to be controlled by Appelbaum to qualify; therefore, he transferred all of his common stock to Glover in exchange for payment later. Payment was never made, and according to Plaintiff's theory, was never expected to be made because Appelbaum still controlled the business behind the scenes. Plaintiff argues that it is implausible for a man to give up 100% of his common shares in a company that was indebted to him in the amount of $1.9 million; later

issue a personal guaranty of payment to the United States Fidelity and Guaranty Company ("U.S. Fidelity"); be the highest paid employee of the business, almost four times as high as Glover; exercise significant control over Warde's employee benefit and profit sharing plans; own the building in which Warde operates; all while being "a Gal Friday" who only "helped when [he] could." All of this information, according to Plaintiff, gives rise to the inference that Defendant Appelbaum maintained a significant amount of control over the business even after Glover assumed control on paper. Plaintiff argues *inter alia* that Defendant had actual knowledge of the unpaid trust fund taxes and willfully paid other creditors instead. Further, and in the alternative, Plaintiff argues that Defendant acted willfully because he recklessly disregarded the risk that the trust fund taxes were not being paid by failing to make a reasonable inquiry into the matter.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *Anderson v. Liberty Lobby,* 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) (same). A genuine dispute exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. In conducting its analysis, the Court views the evidence in the light most favorable to the non-moving party. *Celotex Corp.,* 477 U.S. at 325.

## III. STATEMENT OF FACTS

### A. The Founding of Warde, MBE, and the Transfer of Shares to Glover

Thomas Damiani founded Warde in 1976. (Aff. of Thomas Damiani, Doc. 30-1, at ¶ 2). Warde was a company that performed electrical contracting on smaller and larger jobs in New York; specifically, it installed traffic signals and performed work on bridges, tunnels, and power plants. (Dep. of Eric Appelbaum, Doc. 30-2, at 34:9-25 – 35:1-6). He was the sole shareholder until 1981, when Eric Appelbaum acquired fifty percent of the common stock. (Damiani Aff., at ¶ 2). Thereafter, Appelbaum was the President and controlled the financial end from the office. (*Id.*). Damiani operated the construction end of the business and supervised job sites, signing whatever Appelbaum told him to sign. (*Id.*). During this period, Appelbaum could write checks on behalf of Warde, sign a contract on behalf of Warde, had authority over payroll, and made decisions on company expenditures. (Appelbaum Dep., at 28:9-10, 28:23, 30:1-5).

Appelbaum was also involved in several other businesses. These include L.A.B. Electrical Sales Corp. ("L.A.B.") and Eric Thomas Realty. (*Id.* at 11:16 – 13:2). L.A.B. sold traffic signal equipment (*id.* at 13:17-21), including to Warde (*id.* at 34:13-18). Appelbaum was a 50% owner of Eric Thomas Realty. (*Id.* at 125:9-15). Eric Thomas Realty owned 100 Wells Ave, Congers, New York, the building in which L.A.B. and Warde were located. (*Id.* at 79:12 – 80:2, 125:5 – 126:4).

The business was operated in the above manner until it ran into difficulties in 1994. (Damiani Aff., at ¶ 4). At this time, Appelbaum initiated a plan that would allow Warde to obtain a MBE certification from the State of New York. (*Id.* at ¶ 4). To obtain this certification, one must actually be a minority business owner with fifty-one percent ownership of the entity. N.Y. Exec. Law § 314(2-a)(a)(i) (McKinney). The ownership must be "real, substantial and

**continuing**" and the minority owner must "exercise[] the authority to control independently the day-to-day business decisions of the enterprise." § 314(2-a)(a)(ii-iii); *see also Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 52-56 (2d Cir. 1992) (detailing genesis of state program and related federal program).

In order to achieve MBE certification, Appelbaum required that he and Damiani transfer a specified number of shares to McCoy Glover. (Damiani Aff., at ¶ 4). On March 15, 1994, Appelbaum transferred his 50% interest (100 shares) in Warde to McCoy. (Appelbaum Dep., at 39:23-25); (Doc. 26-2, at 2-3). At the time of the transfer, Appelbaum expected to receive compensation in the amount of $89,404.00. (Appelbaum Dep., at 83:1-10, 87:4-9), (Doc. 26-2, at 4). Appelbaum was to be paid in eighty-nine monthly payments of one thousand dollars and a final payment of four hundred four dollars. (Doc. 26-2, at 4). He never received his end of the bargain and there were no demands made in writing for payment. (*Id.* at 83:1 – 84:3).

On March 31, 1994, the shareholders agreed that Glover would be one member of the Board of Directors, have the authority to designate two others, and the remaining shareholders could designate the final Director. (Doc. 26-3, at 5). Regarding officers, it was agreed that Glover would be President; Damiani, Executive Vice-President; Joseph Donato, Secretary; and Pat Damiani, Vice-President. (*Id.* at 6). Further, it was agreed that all general corporate checks would have to be signed by Glover, who could also designate a comptroller to execute checks. (*Id.* at 7).

Prior to the transferring the entirety of his common shares, Appelbaum had loaned around a 1.9 million dollars to the company. (*Id.* at 40:12-25, 84:19 – 85:24). The loans were made over a period of time and there is no record evidence of these loans. (*Id.* at 41:11-6, 42:17-25). According to Warde's accountant, David Orenstein, these loans were converted into preferred

stock. (Doc. 30-4, at 2). He stated "[t]he attorneys handling the certification process felt that your [Appelbaum's] loans of approximately $2 million to Warde were possibly going to be an issue of 'de facto' control which could disqualify Warde from that designation." (*Id.*). Orenstein stated that later on in the certification process, "the attorneys were informed or led to believe that even your ownership of the preferred stock was not acceptable. You ultimately transferred the preferred stock to Mac [Glover] who did not have the funds to pay for it in return for his personal promise to pay you from *his earnings* from Warde in the future." (*Id.*). Glover died before any payment could be made. *Id.* (emphasis added).

On July 13, 1994, Warde applied for MBE certification which it received.

For ease of reference, the Court will refer to the period after Glover became President as the "Glover Presidency Period." While the Tax Periods fall within the Glover Presidency Period, they do not encompass the entirety of the Glover Presidency period.

B. **The Glover Presidency Period**

After Glover became President, Warde entered into a surety agreement with U.S. Fidelity and Guaranty Company. Appelbaum, among others, signed the agreement on March 14, 1996, issuing a personal guaranty to U.S. Fidelity to pay Warde's debts should Warde be able unable to do so. (Doc. 30-11). Said agreement, of course, was not made *on behalf* of Warde nor was Appelbaum's signature signed as a principal, officer, or director of Warde.

Financial records of Warde from 1996 indicate that Appelbaum worked forty hours a week and was paid $2,046.40 weekly, which equates to a yearly salary of $106,412.80 if fifty-two weeks are worked. (Doc. 30-9, at 5, showing records from late June, July, August, and September of 1996). Damiani, a 39% owner of the company, only received a weekly salary of $1,440.60. (*Id.* at 11). During the same time period, Glover worked less than full time. When

6

Glover worked forty hours, he would receive a weekly salary of $1,000. (*Id.* at 17). The only W-2 that has been produced shows that in 1999 Appelbaum received wages in the amount of $93,100 as an employee of Warde. (Doc. 30-6).[1]

During the Glover Presidency Period, Appelbaum was the trustee for Warde's employee benefit and profit sharing plan. (Appelbaum Dep., at 112:5-15). He was also the trustee for L.A.B.'s employee benefit and profit sharing plan. (*Id.*).[2] To be clear, the Warde Pension Plan & Trust is a separate entity sponsored by Warde before 1999. (Doc. 30-14, at ¶ 7). As of March 9, 1998, Glover was President of the Warde Pension Plan, while Appelbaum was Vice President and Secretary. (Doc. 30-15, at 10-11). Appelbaum took money from the Warde Pension Plan and the L.A.B. Pension Plan and "loaned" it to Warde. (Appelbaum Dep. at 115:1-13). Appelbaum's testimony is that 60-70% of the money in the respective Pension Plans was his. (*Id.* at 118:23-24). He stated that these loans were made to keep Warde afloat and they were eventually not paid back. (*Id.* at 115:6-10, 119:10-13). There was a circular transfer of money going back and forth between the respective Pension Plans, Warde, and L.A.B. (*Id.* at 131:1-18). Appelbaum signed four checks during this Glover Presidency Period and they all involve this circular transfer. All other checks and tax forms were not signed by Appelbaum. Of the four checks he signed, two were signed on behalf of the Warde Pension Plan to Warde. (*Id.* at 129 – 130), (Doc. 30-15, at 2, check dated 10/24/01, at 4, check dated 8/2/01). He also signed two on behalf of Warde, both to the L.A.B. Pension Plan, (Doc. 30-15, at 5, check dated 3/18/99, at 8, check dated 3/23/98). Glover also participated in these transfers. (*Id.* at 6, check dated 8/10/01 from Warde to L.A.B. Pension Plan, at 8, check dated 8/8/01 from Warde to Warde Pension

---

[1] Even though Appelbaum was paid $93,100 during 1999, he states that he only devoted 5% of his time during the Tax Periods (June 1999 to December 2000) to his activities at Warde. (Doc. 26, at ¶ 11).
[2] The employee benefit and profit sharing plans are collectively referred to as "Pension Plans." Whenever they are separately designated, they will be preceded by the name of the sponsoring entity.

7

Plan). Eventually, the Pension Plans in question were "owed" at least seven figures by Warde. (Appelbaum Dep. 162, at 162:2). The total of the checks submitted only account for $135,977.55. *See* (Doc. 30-15). This number was calculated without accounting for Warde's payments that decreased its "debt." It is clear that, at one time, there were far more checks signed on behalf of the Pension Plans to Warde to create such a large "debt."

The parties dispute whether Appelbaum was an officer or director at Warde during the Glover Presidency Period. However, in Appelbaum's responses to the first set of interrogatories, he stated that:

> At the direction of McCoy Glover, Appelbaum may have briefly held the title of Secretary, but he is not certain. He also may have briefly held the title of Vice President, again at the request and direction of McCoy Glover, but he is not certain. **Formalities were not well-observed at Warde**, and McCoy Glover would direct him to briefly take on certain roles and titles for the alleged benefit of the company.

(Doc. 30-17, at 6) (emphasis added). As stated above, it was originally agreed that Donato would serve as the Secretary. However, Donato wrote a letter on December 16, 1996 indicating that he no longer had check writing authority and was no longer a shareholder. (Doc. 30-18); *see also* (Doc. 30-19, letter dated 1/4/00 indicating that he was no longer a shareholder or director). There has been no evidence showing that another Secretary was appointed.

Other than the checks mentioned above, there have been no further checks produced by Plaintiff with Appelbaum's signature.

Despite filing a W-2, Appelbaum claims that he was a "consultant paid as an employee." (Appelbaum Dep., at 50:21-24). As part of this position, Appelbaum would sometimes go to meetings with government agencies and meetings to discuss extra work with other businesses.

(*Id.* at 51-52). There is no direct evidence of Appelbaum having hiring and firing authority and Appelbaum's affidavit disclaims any involvement in such matters.

Even though Appelbaum owned no common shares of the company, he assumed control of the company after Glover's death. (*Id.* at 56:1-25). Even though Appelbaum had ostensibly transferred the preferred shares, said shares appeared *in his name* on the bankruptcy documents. (Doc. 30-3, at 18). In his affidavit submitted in connection with Warde's bankruptcy, Appelbaum did not list himself as a secured or unsecured creditor. (*Id.* at 7-9). He stated that "I think I - - - I got my - - - I got the preferred shares. After Glover died. In lieu of my loans." (Appelbaum Dep. at 57:1-4). The bankruptcy documents, dated June 7, 2002, state that "Eric Appelbaum is the sole Officer, Director, and management official who makes financial and contracting job decisions for the Debtor. He has been associated with the Debtor since its inception in 1977." (Doc. 30-3, at 11).

## IV. ANALYSIS

### A. Responsible Party

26 U.S.C. § 6672(a) provides as follows:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

"Personal liability for a corporation's unpaid trust fund taxes extends to any person who (1) is "responsible" for collection and payment of those taxes; and (2) "willfully fail[s]" to see that the taxes are paid." *Johnson v. United States*, 734 F.3d 352, 359 (4th Cir. 2013) (citation omitted). "Once the IRS assesses a taxpayer for this liability, the taxpayer has the burden of proof at trial on both elements of § 6672 liability." *Id.* The IRS has assessed Appelbaum with this liability,

so he has the burden of proof. However, the fact that "[t]hat a movant bears the ultimate burden of proof or persuasion . . . is no obstacle to a summary judgment award in favor of that party, so long as the requirements of Rule 56 are otherwise satisfied." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 521-22 (4th Cir. 2003).

A "responsible person" is one "required to collect, truthfully account for, and pay over any tax." *See* § 6672(a). "The Supreme Court has interpreted this statutory language to apply to all 'persons responsible for collection of third-party taxes and not [only] to those persons in a position to perform all three of the enumerated duties.'" *Johnson*, 734 F.3d at 360 (quoting *Slodov*, 436 U.S. at 240).

The Fourth Circuit requires that courts undertake a "'pragmatic, substance-over-form inquiry' focused on the person's status, duty, and authority within the corporation" in determining who is a responsible person. *Id.* at 361 (quoting *Plett*, 185 F.3d at 219). "The 'crucial inquiry is whether the person had the 'effective power' to pay the taxes-that is, whether he [or she] had the actual authority or ability, in view of his status within the corporation, to pay the taxes owed.'" *Id.* (quoting *Plett*, 185 F.3d at 219). A person need not have exclusive authority, rather, the enquiry is whether they had "significant . . . authority over corporate finances or management decisions." *Erwin v. United States*, 591 F.3d 313, 321 (4th Cir. 2010)

In determining whether an individual is a responsible person under § 6672, the Court is guided by the following non-exclusive list of factors which focus on whether the individual

1. served as an officer of the corporation or a member of its board of directors,
2. controlled the corporation's payroll,
3. determined which creditors to pay and when to pay them,
4. participated in the corporation's day-to-day management,
5. had the ability to hire and fire employees, and
6. possessed check-writing authority.

10

*See Johnson*, 734 F.3d at 361 (citing *Erwin*, 591 F.3d at 321; *Plett*, 185 F.3d at 219). A party is not automatically assumed to be a responsible person merely because of their status as an officer or director; however, this is a factor that is material to the determination. *Id.* "A taxpayer may be a 'responsible person' if [he or] she 'had the authority required to exercise significant control over the corporation's financial affairs, regardless of whether [he] or [s]he exercised such control in fact." *Id.* (quoting *Purcell v. United States*, 1 F.3d 932, 937 (9th Cir. 1993)).

The factorial analysis above is complicated by the fact that the Warde did not operate "by the books" i.e., formalities were not well observed as stated by Appelbaum. "It is well known that corporations that include only a few shareholders often do not act with as much formality as larger companies. This is especially so where the members of the board personally conduct the business of the corporation." 2 Fletcher Cyc. Corp. § 394.10 (2015); *see New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014) (listing factors of corporate domination that justify piercing). It would be difficult for the Court, at this stage, to give any weight to the corporate formalities of Warde when its constituent members or associates failed to do so.

With regard to Appelbaum's participation in the Warde Pension Plan, the Court will not abandon the substance over form analysis required by the Fourth Circuit merely because it is a separate entity. "A single employer . . . utilizes one or more employees to serve as named fiduciary of the plan or plans sponsored by that employer. The employer's board of directors . . . almost always maintain[] ultimate authority and control of the plans sponsored by that employer." 1 ERISA Practice and Litigation § 6:9. Ignoring Appelbaum's actions involving the Warde Pension Plan would be to ignore the special relationship that a sponsor has with its pension plan.

What Defendant Appelbaum characterizes as pure speculation, the United States characterizes as circumstantial evidence and a series of reasonable inferences. Appelbaum claims that there is "no evidence." However, the Court finds that there is circumstantial evidence supporting the United States' contentions. "Direct evidence of a fact is not always required. Circumstantial evidence is not only sufficient but may also be more certain, satisfying and persuasive than direct evidence." *Whorton v. T. A. Loving & Co.*, 344 F.2d 739, 742 (4th Cir. 1965). At the summary judgment stage, "[a]ny permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001) (citing *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)). "However, such inferences must "fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Id.* (quoting *Thompson Everett, Inc. v. National Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995)).

The Court finds that the United States' argument has merit. Although the United States may be hampered in its ability to prove its case at trial when the Court is not constrained by the summary judgment standard, the United States may still rely upon circumstantial evidence to rebut Appelbaum's testimony. The following is a chain of pieces of circumstantial evidence that tends to show that Appelbaum was truly in charge during the Tax Periods: (1) Appelbaum was in charge prior to the Glover Presidency Period; (2) it was Appelbaum's decision to transfer his and others' shares to Glover; (3) Appelbaum and his accountant, among others, were worried about maintaining appearances in order to keep MBE certification so they did what they could to avoid any documentation that Appelbaum maintained "de facto" control; (4) Appelbaum never received compensation for the transfer of his common shares; (5) Appelbaum was owed a

significant amount of debt by Warde prior to his transfer of the presidency to Glover; (6) Appelbaum converted this debt (which was in the millions) to preferred shares and then transferred the preferred shares to Glover; (7) Appelbaum never received payment for the transfer of preferred shares and said payment was conditioned on Warde's future profits; (8) Appelbaum assumed control of the preferred shares after Glover's death without any documentation supporting a transfer; (9) Appelbaum personally guaranteed Warde's debt to U.S. Fidelity;[3] (10) in the documents that remain, Appelbaum worked more hours and was paid a higher salary than Glover; (11) Appelbaum treated the Pension Plans of L.A.B. and Warde as if it were his own personal bank account – "lending" money from the respective entities in a manner that tends to show that he was well aware of Warde's financial difficulties and played a role in financial decision-making; (12) the entities were located in the same building, Congers, that is indirectly owned by Appelbaum; and (13) Appelbaum assumed control after Glover's death, despite ostensibly not owning any common or preferred shares. Appelbaum's attempt to isolate each piece of circumstantial evidence and explain it away by use of his own testimony will not salvage his motion for summary judgment – these arguments are, however, fair game for trial.

Appelbaum maintains that the submission of his affidavit requires the Court to find that Glover was in complete control during the period of his presidency and that any actions

---

[3] Despite Defendant's arguments to the contrary, personal guarantees have been considered as relevant to whether the individual in question took part in the payment of creditors. *See Erwin v. United States*, No. 1:06CV59, 2007 WL 4823530, at *4 (M.D.N.C. Nov. 27, 2007) ("The evidence also shows that Plaintiff had decision-making authority over which creditors would be paid. He signed personal guarantees to several food vendors, ensuring that those bills would be paid.") *rep. & rec.adopted* 2008 WL 750539 (M.D.N.C. Mar. 18, 2008) *aff'd,* 591 F.3d 313 (4th Cir. 2010). Further, it is reasonable to assume that a person who invests a significant amount of money into a company and guarantees said company's debt will take a keen interest in assuring that the company pays its creditors.

Appelbaum took were done solely at Glover's bidding. However, the above pieces of circumstantial evidence could lead a reasonable jury to find that Appelbaum was in actual control. At this stage of the litigation, the facts as they currently stand show that Appelbaum was much more than a passive investor. "As a general rule, third parties otherwise unconnected with a corporation who make a . . . loan to the corporation do not thereby become persons responsible for the payment of the corporation's withholding taxes." *See First Nat. Bank in Palm Beach v. United States*, 591 F.2d 1143, 1149 (5th Cir. 1979); *O'Connor v. United States*, 956 F.2d 48, 52 (4th Cir. 1992) (silent investors with no authority are not responsible persons). However, this Court is concerned "with actual control and economic reality, not paper facades." *First Nat. Bank*, 591 F.2d at 1149. What will subject a lender to "liability . . . is the assumption of control over how the employer's funds are to be spent and the process of deciding which creditors of the employer are to be paid and which are not, and when." *Commonwealth Nat. Bank of Dallas v. United States*, 665 F.2d 743, 757 (5th Cir. 1982).

Appelbaum's participation in the Pension Plan scheme tends to show that he had a high degree of knowledge of the Warde's fiscal state during the events in question. It tends to show that he was aware of the straits that Warde was in and was willing, in his own words, to sacrifice what he considered his own money to keep the company afloat. At this stage, the Court would be remiss in inferring that Appelbaum had no control of the disbursal of money that he considered his own. Rather, it is reasonable to infer that Appelbaum and Glover decided to put this perhaps misbegotten injection to pay off other creditors to the United States' detriment. The Court finds it significant that both Appelbaum and Glover participated in the scheme. It could be, as Appelbaum argues, that Appelbaum was merely following orders when commingling these funds but a reasonable fact-finder could disagree. For example, what authority did Glover have

14

to order Appelbaum to raid Appelbaum's other businesses for the benefit of Warde? Appelbaum's conceivable failure to recognize the differences between the various businesses in the building that he indirectly owns also tends to show he had a significant role to play in each business. *See United States v. Vespe*, 868 F.2d 1328, 1332-33 (3d Cir. 1989).

It could be that Appelbaum gave Glover complete control of Warde after installing him as president; however, a reasonable fact-finder could find that Glover's presidency was a sham from the start and only used as a mechanism to gain an advantage over competitors by obtaining an MBE certificate.

Further, a reasonable fact-finder could believe that Glover was beholden to Appelbaum because he owed him *personally* for the amounts of the stock, both preferred and common. At this stage, it is reasonable to assume that Appelbaum had considerable leverage over Warde's management, direction, and financial decisions. *Cf. Causey v. United States*, 683 F. Supp. 1381, 1384 (M.D. Ga. 1988) (noting that a factor weighing in favor of finding person to be a responsible person was that "he could have closed the business simply by foreclosing on the debt owed to him. This power to control the ultimate destiny of the company allowed him to influence the day-to-day operations of the business.").

Even though, at this stage, the Court finds that Appelbaum may have had some on and off titular authority within Warde, this is not required. For example, Judge Underhill recognized that a person who "held no formal officer position at Nutmeg and did not formally own any shares of the company" was still a responsible person because he "was deeply involved in financial matters . . . and had significant practical control over the finances of the company." *Mahler v. United States*, 121 F. Supp. 2d 179, 194 (D. Conn. 2000) *aff'd,* 29 F. App'x 777 (2d Cir. 2002). There, it was recognized that "[h]is lack of formal role stands in stark contrast to the

fact that he was paid as much as, and at times more than, any other employee" and that "the absence of his formal role is explained by his desire to avoid collection of an outstanding financial obligation to the City of New York." *Id.*

Like the taxpayer in *Mahler*, Appelbaum ostensibly held no *formal* position and did not *formally* own shares. However, the standard of review requires the Court to conclude that he was deeply involved in financial matters as evidenced by portions of his deposition testimony and, in particular, his participation in the scheme to keep the company afloat. Just as the taxpayer in *Mahler* had an incentive to downplay his role in the company, Appelbaum had an incentive to downplay his role to ensure that Warde became and remained MBE certified. *See, e.g.*, *Ne. Stud Welding Corp. v. Webster*, 211 A.D.2d 889, 890, 621 N.Y.S.2d 170, 171 (1995) (example of investigation into MBE certification); *see also* N.Y. Exec. Law § 314 (McKinney) (stating that licensure may be revoked after it is obtained); N.Y. Comp. Codes R. & Regs. tit. 5, § 144.6 (current revocation regulation). Further, just as the taxpayer in *Mahler* had the highest salary, the only evidence in the record regarding salaries shows that Appelbaum had a higher salary the President at the time. *See also In re Branagan, Jr.*, 345 B.R. 144, 164 (Bankr. E.D. Pa. 2006) (fact that father installed son as president did not prevent father from being responsible person, father was company's founder, *de facto* lessor, guarantor of company's loans, and creditor of the company); *Bersani v. United States*, No. 70-CV-44, 1974 WL 739, at *1 (N.D.N.Y. Nov. 18, 1974) ("As a matter of record, he was neither stockholder, officer or director of Auto Dynamics. He contends that his sole relationship with Auto Dynamics was that of landlord through his control of Primex. The evidence, however, indicates Bersani was exerting practically complete control over the operation of Auto Dynamics. He was the boss. To find otherwise would require the court to join the plaintiff's masquerade. The lack of record

association with Auto Dynamics did not insulate him against liability for the assessment being enforced.").

The focus in on Appelbaum's "effective power" which is his "ability, in view of his status within the corporation, to pay the taxes owed." *Johnson*, 734 F.3d at 361. Construing the facts and all reasonable inferences in the light most favorable to the United States, the Court cannot find as a matter of law that Appelbaum was not a responsible party during the Tax Periods.

### B. Willfulness

After denying Appelbaum's motion for summary judgment as to whether he qualifies as a responsible person, the Court must still determine whether or not there is a sufficient factual dispute as to whether Appelbaum "'willfully' failed to collect, account for, or remit payroll taxes to the United States." *Id.* at 364. "This enquiry focuses on whether [Appelbaum] had 'knowledge of nonpayment or reckless disregard of whether the payments were being made." *Id.* (quoting *Plett*, 185 F.3d at 219). "The principal component of willfulness is knowledge: a responsible person acted willfully within the meaning of § 6672(a) if he (a) knew of the company's obligation to pay withholding taxes, and (b) knew that company funds were being used for other purposes instead." *United States v. Rem*, 38 F.3d 634, 643 (2d Cir. 1994). However, "a responsible person's failure to cause the withholding taxes to be paid is not willful if he believed that the taxes were in fact being paid, so long as that belief was, in the circumstances, a reasonable one." *Id.* "It is no excuse that, as a matter of sound business judgment, the money was paid to suppliers and for wages in order to keep the corporation operating as a going concern-the government cannot be made an unwilling partner in a floundering business." *Collins v. United States*, 848 F.2d 740, 741-42 (6th Cir. 1988). "[C]ourts

17

have held that reliance upon the statements of a person in control of the finances of a company may constitute reckless disregard when the circumstances show that the responsible person knew that the person making the statements was unreliable." *Thomsen v. United States*, 887 F.2d 12, 18 (1st Cir. 1989). "Whether someone has acted willfully is an inquiry . . . necessarily directed to the state of the responsible person's mind. As such, this is the quintessential jury issue." *Turpin v. United States*, 970 F.2d 1344, 1350 (4th Cir. 1992) (citations and quotations omitted).

Appelbaum maintains that he could not have acted willfully because he (1) was only generally aware that Warde was having issues paying its taxes; (2) understood that Glover had made a deal with the IRS on behalf of Warde; and (3) that Warde was performing said deal. Appelbaum's deposition testimony indicates that:

> I know in '99 I knew about there was problems paying the taxes, but McCoy Glover had made a deal with the IRS that he would make back payment and future payments to catch up.
> And that, in addition, the surety backing up the whole deal. So he made a with - - - he made a deal where he was going to pay $35,000 - - - I think it was $35,000 a week, which he - - - which was - - - I think covered old payments.
>
> . . .
>
> In '99 he told me that he had a plan to pay, he had an agreement to pay the IRS back money and new money from the receivables coming in. And as the jobs got finished, I guess he figured to use the retainages to keep it going.

(Doc. 30-2, at 133:21 – 134:22).

The terms of said "agreement" are memorialized in Exhibit C to Appelbaum's Affidavit (Doc. 26-4) which is a letter to the IRS from Glover that was faxed by Appelbaum to his accountant, Orenstein. (Appelbaum Dep., at 135:1-8). It refers to Warde's "intent with respect to payment of unpaid 941 taxes for 1999" and provides certain terms. It provides that beginning on December 10, 1999, Warde would deliver $35,000.00 weekly until all amounts are paid and that on or before January 23, 1999, a check for $250,000.00 would be paid. (Doc. 26-4). This is the same time period that Warde was hemorrhaging the accounts of the Pension Plans of both

18

Warde and L.A.B. – something that Appelbaum was aware of and participated in. It would be difficult, at this stage, to conclude that Appelbaum was not at very least reckless as to whether the taxes were being paid. If Warde was required to commingle Pension Plan funds just to keep the business running when a receivable was delayed (Appelbaum Dep., at 159:4-8) then it certainly reasonable to infer that Appelbaum knew Warde and Glover were not performing in accordance with the "intent" expressed in letter to the IRS. It is reasonable to infer that Appelbaum knew that preference was made to ongoing concerns of Warde at the expense of the United States Treasury. Accordingly, the Court holds that there is a genuine issue of material fact as to whether Appelbaum had the requisite intent under § 6672.

**IT IS, THEREFORE, ORDERED THAT APPELBAUM'S MOTION FOR SUMMARY JUDGMENT IS DENIED. THE CASE WILL PROCEED TO TRIAL AS SCHEDULED IN NOVEMBER.**

Signed: October 2, 2015

Richard L. Voorhees
United States District Judge